# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FRIDAY APALISKI, ANGELIQUE FISH, JOHN JOYAL, JAMIE WATERMAN, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiff, | **DEMAND FOR JURY TRIAL** |
| vs. | |
| MOLEKULE, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

1.     This consumer class action arises from the marketing, sale and distribution of defective air purification devices by Molekule, Inc. ("Defendant" or "Molekule") called the Molekule Air, Air Mini, and Air Mini+ (the "Air Purifiers").

2.     Described by Defendant as "the world's first molecular air purifier," the Molekule devices depends on a proprietary Photo Electrochemical Oxidation ("PECO") filter to remove pollution from the air. Not only does Defendant's PECO filter perform worse than traditional HEPA air purifiers, the PECO filter also does not remove any pollution from the air (the "Defect").

3.     In marketing the Air Purifiers, Molekule made a number of misrepresentations regarding the performance, abilities, and benefits of the Air Purifiers, including that the Air Purifiers: (1) use PECO filter technology that "outperforms HEPA filters in every category of pollutant"; (2) "eradicate[] the full spectrum of indoor air pollutants;" (3) are capable of achieving quantified pollution-removal benchmarks (for example, that an Air Purifier "destroys 1 million allergens in 4 minutes"); (4) were subject to "independent testing" that served as the basis for Molekule's representations; (5) are rated to function in rooms of certain sizes; (6) provide allergy and asthma symptom relief; and (7) combat "unhealthy levels" of wildfire smoke since "Molekule Air Purifiers not only filter out ash and debris from smoke – they destroy airborne pollutants." Additionally, Molekule has tailored its advertising to capitalize on current events, claiming, for example, that the Air Purifiers "destroy" coronavirus.

4.     These representations were promulgated to the public through

Defendant's website, YouTube videos, social media, testimonials (both from individuals and medical professionals), published interviews with Defendant's founders, and other online media.

5. But Molekule's representations did not hold up under scrutiny. Consumer Reports, a consumer-oriented 501(c)3 organization dedicated to reviewing products, declared that the Molekule Air "almost flunked" the standard array of tests through which it puts air purifiers. Perry Santanachote, *Does The Molekule Air Purifier Live Up To The Hype?*, ConsumerReports.org (Dec. 9, 2019), *available at* https://www.consumerreports.org/air-purifiers/molekule-air-purifier-review/ (last visited November 17, 2020). Wirecutter, a technology review website affiliated with the New York Times, described the Molekule as "The worst air purifier we've ever tested." Tim Heffernan, *Molekule: The Worst Air Purifier We've Ever Tested*, Youtube.com (Oct. 31, 2019), *available at* https://www.youtube.com/watch?v=VM9CJZpqfpA (last visited November 17, 2020); Tim Heffernan, The Best Air Purifier, Wirecutter.com (May 13, 2020), *available at* https://thewirecutter.com/reviews/best-air-purifier/#molekule-the-worst-air-purifier-weve-ever-tested (last visited November 17, 2020).

6. Wirecutter tested one claim in particular and found that the Molekule Air did not come close to satisfying it. Molekule had claimed on its website and in various advertisements that its "scientifically-proven nanotechnology outperforms HEPA filters in every category of pollutant." *Id.* Tests that pitted the Molekule Air against HEPA filter devices revealed, however, that on every setting the Molekule Air produced results that were substantially worse than its competition. Indeed, on

the lowest setting, the Molekule Air "results look worse than what you see with no purifier running at all." After this review was published Molekule scrubbed the contested claim from its website. *Id.*

7.    Molekule's representations also fared poorly when scrutinized by advertising industry watchdogs. When a competing manufacturer of air purifiers challenged over two dozen of Molekule's representations in a proceeding before an organization that investigates advertising representations, that organization (and its appellate division) concluded that almost none of Molekule's representations were supported by evidence. In response, Molekule agreed to alter its advertising to omit those unsubstantiated statements.

8.    Defendant engaged in a deceptive and misleading marketing campaign to sell Air Purifiers based on misrepresentations and omissions that it spread through its own website, social media, interviews with third-party publications, YouTube, and other fora. Defendant's greed-driven scheme is at the expense of consumers across the country and in violation of applicable law.

9.    Consumers like Friday Apaliski, Angelique Fish, John Joyal, and Jamie Waterman ("Plaintiffs") purchased the Air Purifiers after relying on Molekule's false and misleading representations and received defective devices that could not perform as advertised. Many consumers purchased Air Purifiers based on Defendant's representation that PECO filters are superior to HEPA filters—an indisputably false claim. Defendant's advertisements are replete with misrepresentations that the Air Purifiers would "completely eliminate" indoor pollution, a falsehood that motivated Plaintiffs class members to purchase the Air

Purifiers. Similarly, customers purchased Air Purifiers based on Defendant's representations that the device would ameliorate their air quality from wildfires as well as allergies and/or asthma symptoms only to find that the product offered no therapeutic benefit whatsoever.

10.    Though Molekule touted the Air Purifiers, which are among the most expensive available, as a premium air purification device featuring revolutionary and superior new technology, it knew or should have known about the Defect and that the Air Purifiers could not perform as represented. Despite this knowledge, Molekule failed to disclose the truth to purchasers of Air Purifiers and continues to promote false and unsubstantiated representations to attract new purchasers. Defendant unjustly profits on these falsehoods by selling Air Purifiers and replacement parts and accessories thereto.

11.    Plaintiffs and Class members have suffered injuries in fact, incurred damages, and have otherwise been harmed by Defendant's conduct.

12.    Accordingly, Plaintiffs seek redress for Defendant's unlawful conduct. Plaintiffs also seek money damages and equitable relief for Defendant's conduct described herein.

## PARTIES

### A.    PLAINTIFF

13.    At all relevant times, Friday Apaliski has been a citizen of California, residing in San Francisco, California.

14.    At all relevant times, Angelique Fish has been a citizen of Michigan, residing in Hillsdale, Michigan.

15.     At all relevant times, John Joyal has been a citizen of Massachusetts, residing in Longmeadow, Massachusetts.

16.     At all relevant times, Jamie Waterman has been a citizen of California, residing in Petaluma, California.

**B.     DEFENDANT**

17.     Defendant Molekule, Inc. is a corporation formed under the laws of the State of Delaware with its headquarters in San Francisco, California.

18.     Molekule was launched in May of 2016 and is a family business: it was co-founded by Yogi Goswami (Chief Scientist), a Professor and the director of the Clean Energy Research Center at the University of South Florida, and his adult children, Dilip Goswami (CEO) and Jaya Rao (COO).

19.     By early 2020, Molekule had secured approximately $96.4 million in funding from investors.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs.  This is a putative class action in which more than two-thirds of the proposed class members are citizens of states other than the state in which Defendant is deemed to reside. In addition, this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over Molekule because it is

incorporated in the State of Delaware; has consented to jurisdiction by registering to conduct business in this state; maintains sufficient contacts in Delaware; and otherwise intentionally avails itself of the markets within Delaware through the promotion, sale, marketing and distribution of its Air Purifiers in and from Delaware, which renders the exercise of jurisdiction by this Court proper and necessary as Molekule is "at home" in Delaware.

22.    Venue is proper in this Court under 28 U.S.C. § 1391 because Molekule is incorporated within this District and a substantial part of the events or omissions giving rise to the claims of at least one Plaintiff occurred in this District.

## FACTS SPECIFIC TO PLAINTIFFS

### A. Friday Apaliski

23.    On or around October 17, 2017, Ms. Apaliski purchased a Molekule Air purifier from a brick and mortar store named Sprout in San Francisco for approximately $776.87.

24.    Sprout specializes in selling non-toxic baby and young child products, and the owner of Sprout thoroughly vets the products that she sells.

25.    Prior to purchase, Ms. Apaliski had learned about Defendant's representations of its products from the owner of Sprout. These advertisements stressed the superiority of Defendant's products versus that of its direct competitors, and its ability to eliminate toxins like flame retardant chemicals and VOCs that can pollute the air, including during wildfire events.

26.    Ms. Apaliski specifically relied upon Defendant's representation that Molekule's proprietary PECO-filter technology could provide better indoor air

quality than competitors' HEPA filters, including by addressing flame retardant chemicals and VOCs that were present in the air, including during wildfire events.

27.     In addition, Ms. Apaliski has seen Defendant's representations regarding Molekule's superior technology, which persuaded her to keep using her Molekule Air and to purchase the consumable filter.

28.     At all relevant times, Ms. Apaliski used and maintained her Molekule Air as would any reasonable consumer and in accordance with Defendant's instruction.

29.     After months of using her Molekule Air as would any reasonable consumer and in accordance with Defendant's instruction, Ms. Apaliski did not notice a significant improvement in the air quality of her home and continued to endure the presence of airborne irritants, despite Defendant's claim that Molekule products could eliminate these particles.

30.     Ms. Apaliski has changed the filter in her device during her ownership of it despite the app never saying that it needed to be changed. Molekule initially provided her with one new filter. Ms. Apaliski later purchased another new filter during her ownership of the Molekule Air, believing that a filter replacement would improve the functioning of the product. The filter that she purchased had a bad odor, and Molekule replaced it. However, even after using these new filters, Ms. Apaliski did not notice a significant improvement in the performance of her Molekule device.

31.     In addition to experiencing diminishing effect of the Molekule Air (specifically when trying to eliminate VOCs in the house), after reading the

Consumer Reports and Wirecutter articles, Ms. Apaliski gave up on using the device. Rather, Ms. Apaliski has purchased three smaller Blue Air purifiers for her home for the last fire season.

32.     Ms. Apaliski would not have purchased the Molekule Air, or any other Molekule device including the filter, if she had been aware the brand's representation of the device's performance, capabilities, and benefits were unsubstantiated, or that Molekule actively worked to conceal the device's defective nature.

**B. Angelique Fish**

33.     On or around April 5th, 2020, Ms. Fish purchased a Molekule Air Mini from Amazon.com for approximately $499.00.

34.     Prior to purchase, Ms. Fish had seen Defendant's banner advertisements on Facebook. These advertisements stressed the superiority of Defendant's products versus that of its direct competitors.

35.     Ms. Fish specifically relied upon Defendant's representation that Molekule's proprietary PECO-filter technology could provide better indoor air quality than competitors' HEPA filters.

36.     At all relevant times, Ms. Fish used and maintained her Molekule Air Mini as would any reasonable consumer and in accordance with Defendant's instruction.

37.     After four months of using her Molekule Air Mini as would any reasonable consumer and in accordance with Defendant's instruction, Ms. Fish noticed no improvement in the air quality of her home and continued to endure the

presence of airborne irritants, despite Defendant's claim that Molekule products could eliminate these particles.

38.     Ms. Fish purchased one additional PECO filter during her ownership of the Molekule Air Mini, believing that a filter replacement may resolve her issues with the product. However, after purchasing this additional filter, Ms. Fish noticed no improvement in the performance of her Molekule device. She no longer uses her Molekule Air Mini since the device did not work as advertised or as should even the most basic air purifier product.

39.     Ms. Fish would not have purchased the Molekule Air Mini, or any other Molekule device, if she had been aware of misrepresentations about the Air Purifiers' performance, capabilities, and benefits, and that Molekule actively worked to conceal the device's defective nature.

**C. John Joyal**

40.     In or around the Summer of 2017, Mr. Joyal purchased three Molekule Air units from Amazon.com for approximately $500.00 each, bringing the total purchase price to approximately $1,500.00.

41.     Prior to purchase, Mr. Joyal had seen Defendant's banner advertisements on Facebook. These advertisements stressed the superiority of Defendant's products versus that of their direct competitors, including air purifiers that used HEPA filters.

42.     Mr. Joyal specifically relied upon Defendant's representation that Molekule's proprietary PECO-filter technology could provide better indoor air quality than competitors' HEPA filters.

43.     At all relevant times, Mr. Joyal used and maintained his Molekule Air units as would any reasonable consumer and in accordance with Defendant's instruction.

44.     At no point during his ownership or use of the Molekule Air units did Mr. Joyal notice any improvement in the air quality of his home and continued to endure the presence of airborne irritants, despite Defendant's claim that Molekule products could eliminate these particles.

45.     Mr. Joyal no longer uses his Molekule Air units since the devices did not work as advertised or as should even the most basic air purifier product. He has subsequently spoken with a friend who owns an air purifier produced by one of Molekule's competitors and decided to purchase that air purifier product as a replacement. Mr. Joyal is thoroughly satisfied with the performance of this replacement air purifier product and its HEPA-filter's ability to capture and remove airborne irritants or pollutants. Had he known what he knows now, Mr. Joyal would have purchased this purifier to begin with, rather than the Molekule Air.

46.     Mr. Joyal would not have purchased the Molekule Air, or any other Molekule device, if he had been aware the brand's representation of the device's performance, capabilities, and benefits were unsubstantiated, or that Molekule actively worked to conceal the device's defective nature.

**D. Jamie Waterman**

47.     In or around December 2019, Mr. Waterman purchased a Molekule Air from the brick and mortar retailer b8ta for approximately $799.00 along with

two filters which cost $50 apiece. Plaintiff Waterman purchased the items from the b8ta location at 1530 Redwood Hwy c021, Corte Madera, CA 94925.

48.    Plaintiff Waterman was in the market for an air purifier, particularly one that would mitigate the effects of wildfire smoke and help with his allergies.

49.    Prior to purchase, Mr. Waterman had seen a web-based online advertisement for Molekule. This advertisement stressed the superiority of Defendant's products versus that of its direct competitors.

50.    At b8ta, Mr. Waterman saw point of sales ads for Molekule that also made the superiority representation, including that Molekule was the most effective air purifier on the market.

51.    Mr. Waterman spoke at length with a sales representative at b8ta who repeated a number of representations that Molekule had made about its Air Purifiers in its advertising. The representative also showed Mr. Waterman Molekule advertising on his smartphone. The representations included: (1) the PECO filter outperforms HEPA filters and other air purifiers; (2) the Air Purifiers destroy the full spectrum of indoor air pollutants, unlike other air purifiers; (3) the Air Purifiers combat wildfire smoke by filtering out ash and debris and destroying pollutants, particularly VOCs, including from plastic; and (4) the Air Purifiers provide allergy relief. The sales representative and Mr. Waterman also unboxed the Molekule Air in the store prior to purchase and Mr. Waterman remembers seeing a representation that the Air Purifiers were the "path to pure air" in paperwork from the box.

52.    Mr. Waterman specifically relied on these representations prior to his

purchase.

53.     To Mr. Waterman's dismay, the Molekule Air did not improve indoor air quality. This happened despite the fact that, at all relevant times, Mr. Waterman maintained the device in a manner typical of a reasonable consumer and in accordance with the Defendant's instructions.

54.     After about a month and a half of using the Molekule Air, and seeing no difference in air quality, Mr. Waterman traveled back to the Corte Madera b8ta retail location from his home in Petaluma, California. He tried to return the Air Purifier but b8ta refused to take it back and give him a refund.

55.     He would not have purchased the Molekule Air if he had known about the Defect or that Defendant was misrepresenting the performance, capabilities, and benefits of the Air Purifiers. In particular, he would not have purchased an Air Purifier if he had known that Defendant's representations were false and that Defendant concealed the product's defective nature.

56.     After Mr. Waterman discovered the Defect and false advertising, he bought a Winnix c545 HEPA air purifier for approximately $100. He has been happy with the Winnix unit's performance. Had he known the true nature of the Molekule Air Purifier at the time of purchase, he would not have bought it, but rather, purchased a Winnix c545 or a Dyson Pure Cool purifier.

## COMMON FACTUAL ALLEGATIONS

57.     Indoor air purification is a burgeoning market. In 2019 the global air purifier market was estimated at $8.04 billion and is expected to grow to $18.21 billion by 2027. Grand View Research, *Air Purifier Market Size Worth $18.21*

*Billion By 2027 | CAGR: 10.8%*, GrandviewResearch.com (February 2020), *available at* https://www.grandviewresearch.com/press-release/global-air-purifier-market (last visited November 17, 2020). HEPA technology currently makes up the largest segment of the market with a share of 37.8%. *Id.*

## A.   Molekule's Air Purifiers

58.    Defendant made the Molekule Air available for preorder on May 24, 2016, touting the device as "the world's first molecular air purifier"—and no less than a "catalyst for human progress"—the Air Purifiers utilize a combination of mechanical prefilter and Defendant's PECO filter to remove pollutants from indoor air. *Molekule Launches the World's First Molecular Air Purifier,* Molekule.com (May 24, 2016), *available at* https://assets.molekule.com/2016-05-24+-+Molekule+Launch.pdf (last visited November 17, 2020). Defendant began shipping the Molekule Air to North American purchasers in 2017.

59.    Defendant currently offers three models of Air Purifiers, including the Molekule Air, which is described by Defendant as being for rooms up to 600 square feet, and retails for $799, and the Air Mini and Air Mini+, which are intended for rooms of up to 250 square feet, and retail for $399 and $499, respectively. The Air Purifiers are available for purchase on Defendant's website and through a select few retailers. Defendant also offers a replacement filter subscription service for $129 per year.

60.    Molekule's Air Purifiers use a two-step filtration system: air is first forced through a pre-filter, which captures larger particles such as dust, pollen, and textile fibers, and then through the PECO filter, which purportedly destroys smaller

particles such as gases, VOCs, and bioaerosols (*e.g.*, bacteria and viruses). Sonia Easaw, *Why We Think Molekule Is the Best Air Purifier on the Market*, Molekule.com (August 31, 2019), *available at* https://molekule.science/why-we-think-molekule-is-the-best-air-purifier-on-the-market/ (last visited November 17, 2020).

61.     Defendant marketed the PECO filter as a "revolutionary technology" and "a fundamentally new approach to air purification by completely eliminating the full spectrum of indoor pollutants, breaking them down on a molecular level." *Id.* This is achieved, Defendant claims, through the use of PECO technology that "works when a nanoparticle-coated filter is activated by light generating a reaction on the surface of the filter, breaking down pollutants including allergens, bacteria, viruses, mold and VOCs [volatile organic compounds]." *Id.* According to Molekule, this process "converts [pollutants] into safe substances, such as carbon dioxide and water vapor."  *Id.*

62.     Molekule is the only commercially available air purification device that uses PECO filtering technology; HEPA is the dominant filter technology in retail air purifiers. A HEPA filter works mechanically, by forcing air through a fine mesh that traps harmful particles. As per the United States Department of Energy standard, HEPA filters 99.97% of all particles of 0.3 micrometer in diameter, with efficiency increasing for larger particles. Sonya Barnette, *Specification for HEPA Filters Used by DOE Contractors — DOE Technical Standards Program*, www.standards.doe.gov (Jun 23, 2015), *available at* file:///C:/Users/class/Downloads/file (last visited November 17, 2020).

63.     HEPA filtration devices commonly deploy a carbon filter to capture

smaller particles that could pass through a HEPA filter. A carbon filter uses a

chemical process called adsorption that chemically binds minute particles and

gases to the carbon in the filter, removing them from the air. When combined,

HEPA and carbon filters are able to remove up to 99.95% of airborne particles up

to 0.1 micrometer in diameter.

**B.     Molekule's Representations**

64.     In marketing the Air Purifiers, Molekule made a number of

representations regarding the performance and abilities of the Air Purifiers and the

benefits purchasers should expect to gain therefrom. These representations fall into

the following broad categories: (1) representations that the Air Purifiers use

technology that outperforms HEPA filters; (2) representations that the Air Purifiers

completely destroy indoor air pollution; (3) representations that the Air Purifiers

are capable of achieving quantified pollution-removal benchmarks (for example,

that an Air Purifier "destroys 1 million allergens in 4 minutes"); (4) representations

that Molekule's assertions about the Air Purifiers were based on "independent

testing;" (5) representations that the Air Purifiers are rated to function effectively

in rooms of certain sizes; (6) representations that the Air Purifiers provide allergy

and asthma symptom relief; and (7) representations that attempt to capitalize on

current events.

65.     These representations were promulgated to the public through

Defendant's website, YouTube videos, social media, testimonials (both from

individuals and medical professionals), third party publications, and other online media. Below is a selection of representations made by Molekule since launching the Air Purifiers.[12]

66.  **Superiority Over HEPA Filters**

    a.  "There's a clear winner in the fight against pollutants. **Our scientifically-proven nanotechnology outperforms HEPA filters in every category of pollutant** from well-known allergens like dust, pollen, and pet dander to microscopic pollutants like mold, viruses, bacteria, and gaseous chemicals." Molekule.com (July 3, 2018) (emphasis added).

    b.  "**PECO: The clear winner against HEPA. Traditional HEPA filters only collect some pollutants. PECO destroys them, including VOCs and mold,** with modern, breakthrough science." Molekule.com (November 10, 2019) (emphasis added).

---

[1]    Plaintiff refers to archives of Molekule's website captured on May 23, 2016 (available at https://web.archive.org/web/20160523041848/http:/molekule.com/), May 13, 2017 (available at https://web.archive.org/web/20170513025916/https://molekule.com/), July 3, 2018 (available at https://web.archive.org/web/20180703204640/https://molekule.com/), November 10, 2019 (available at https://web.archive.org/web/20191110000559/https://molekule.com/air-purifiers) and April 2, 2020 (available at https://web.archive.org/web/20200402105329/https://molekule.com/air-purifiers). These archives are available through the Internet Archive "Wayback Machine" *See* https://archive.org/web/.

[2]    The list of claims below is not exhaustive and omits many overlapping and/or duplicative variations on the falsehoods detailed herein.

c. "**Molekule doesn't capture pollutants, it eliminates them**." Molekule.com (May 13, 2017) (emphasis added).

d. "Finally, **an air purifier that actually works**." Molekule.com (July 3, 2018) (emphasis added).

67.   **Complete Destruction of Indoor Pollutants**

a. "**By fully eliminating indoor air pollutants**, Molekule doesn't just offer noticeable relief to asthma and allergy sufferers but provides a safe living environment for everyone." *Molekule Launches the World's First Molecular Air Purifier,* Molekule.com (May 24, 2016), *available at* https://assets.molekule.com/2016-05-24+-+Molekule+Launch.pdf (last visited November 17, 2020) (emphasis added).

b. "MOLEKULE CAN HELP. What if you woke up feeling refreshed, clear-headed and ready to tackle the day? By transforming your air, you transform your state of mind. **Find comfort in knowing that the world's purest air is coming to your home**." Molekule.com (May 23, 2016) (emphasis added).

c. "'It's a tremendous feeling,' Yogi Goswami said. 'The first great feeling was when **we showed we could 100 percent disinfect the air completely**, but my main motivation was seeing that this is helping my son, and I hope it will help everyone else also.'" Anastasia Dawson, *USF Engineer Invents*

*Air Purifier to Combat Asthma, Allergies*, TAMPA BAY TIMES (May 28, 2016), *available at* https://www.tampabay.com/news/education/college/usf-engineer-invents-air-purifier-to-combat-asthma-allergies/2279374/ (last visited November 17, 2020) (emphasis added).

d.  "Molekule catches and eliminates pollutants 1,000 times smaller than any other filter on the market, **making us the only technology that eradicates the full spectrum of indoor air pollutants**." Molekule.com (May 23, 2016) (emphasis added).

e.  "Molekule **completely eliminates** even the most microscopic pollutants like Allergens, Mold, Bacteria, Viruses and Chemicals." Molekule.com (May 23, 2016) (emphasis added).

f.  "Molekule's patented technology, Photo Electrochemical Oxidation (PECO), works at the molecular level to **eliminate indoor air pollution**" Molekule.com (May 13, 2017) (emphasis added).

g.  "**Truly clean air**, year-round." Molekule.com (November 10, 2019) (emphasis added).

h.  In advertisements that were shown to Facebook and Instagram users all over the United States, Defendant claimed: "This technology not only removes larger particles, like dust, dander, and pollen, but destroys microscopic allergens, like bacteria,

viruses, mold, and airborne chemicals. Don't just collect allergens. Destroy them." Facebook Ad Library, Molekule Paid Advertisement (Beginning September 19, 2019) *available at*

https://www.facebook.com/ads/library/?id=897091407329568

(last visited November 17, 2020). This advertisement included an animation showing particles entering an Air Purifier, where all particles are destroyed, and clean, particle-free air exiting the device.

i.   In advertisements that were shown to Facebook and Instagram users all over the United States, the text "Molekule destroys mold and viruses" was shown alongside an animation of particles labeled "mold" and "virus" entering an Air Purifier and dissolving under text stating "light activates nano filter" "breaking molecular bonds" "**creating clean pollutant-free air**." Facebook Ad Library, Molekule Paid Advertisement (Beginning July 10, 2019) *available at* https://www.facebook.com/ads/library/?id=679621162465617 (last visited November 17, 2020).

j.   In advertisements that were shown to Facebook and Instagram users all over the United States, Defendant claimed: "Molekule **completely eliminates** airborne allergens, mold, dust, bacteria, viruses, and VOCs and makes the air you breathe healthy

again." "Try a radically different air purifier." "Molekule destroys allergens, mold, dust, bacteria and VOCs—chemicals, linked to cancer. A light activated nano-filter breaks molecular bonds, **completely destroying pollutants, leaving only clean air**." Facebook Ad Library, Molekule Paid Advertisement (Beginning September 13, 2018) *available at* https://www.facebook.com/ads/library/?id=171923143710358 (last visited November 17, 2020).

68. **Quantified Pollutant Destruction Representations**

a. "3.9 Million E.Coli bacteria sprayed into Molekule - **100% of them were eliminated**." Molekule.com (May 23, 2016) (emphasis added).

b. The majority of Defendant's quantified pollutant destruction representations are reflected in images that were displayed on Defendant's website for the duration of the Class Period. Below are several such representations from Defendant's website as of May 23, 2016:



c. Below are several more representations of a similar nature from

Defendant's website as of July 3, 2018:





69.  **Independent Testing**

a.  "Rigorously tested, **the science of Molekule has been independently verified by third parties** like the University of Minnesota, Particle Calibration Laboratory" and "University of South Florida Center for Biological Defense." Molekule.com (May 23, 2016) (emphasis added).

b.  "**Independent lab studies have shown** 3.9 million E.Coli completely eliminated in a single pass through a Molekule system." Molekule.com (May 13, 2017) (emphasis added).

c.  "**Independent lab results have shown** that PECO destroys VOCs quickly and efficiently" Molekule.com (July 3, 2018) (emphasis added).

d.  "Mold (ranging from 1 to 100 microns in size) spreads through the air and finds surfaces to grow on. While filters can catch

mold, they also become perfect places for mold growth. Eventually, this mold gets released back into the air. Because nothing is collected during the PECO process, mold is quickly and permanently removed from the air. **Independently tested at University of South Florida's Center for Biological Defense**" Molekule.com (July 3, 2018) (emphasis added).

e.  "VOCs - (ranging from 0.0001 to 0.001 microns) are too small for even best-in-class HEPA filters. Independent lab results have shown that PECO destroys VOCs quickly and efficiently. HEPA filters are unable to remove airborne chemicals from the air, even after long periods of time. Carbon filters, while able to capture some chemicals from the air, re-emit these same chemicals back into the room. **Independently tested at University of Minnesota's Particle Calibration Laboratory**" Molekule.com (July 3, 2018) (emphasis added).

f.  "Viruses, like VOCs, are microscopic (ranging from 0.001 microns to 0.1 microns) and are too small for HEPA to catch. PECO offers the first effective solution at managing the spread of airborne infectious diseases. In just two minutes, Molekule can eliminate hundreds of airborne viruses that are brought in by people or pets. **Independently tested at University of Minnesota's Particle Calibration Laboratory**" Molekule.com (July 3, 2018) (emphasis added).

g. "**Independent testing reveals** Molekule's PECO technology successfully destroys mold, bacteria and viruses"). Molekule.com (April 2, 2020) (emphasis added).

70. **Room Size**

a. "Made for Large Rooms Molekule is able to **completely replace the air in a 600 square foot room (large living room) once an hour.** Its 360° air intake pulls in pollutants from all sides, projecting clean air evenly across the entire room." Molekule.com (July 3, 2018) (emphasis added).

b. "**Molekule Air replaces the air in a 600 sq. ft. room every hour**. Its 360-degree air intake pulls in pollutants from all sides. It uses PECO technology to destroy them and release clean air evenly across the entire room." Molekule.com (April 2, 2020) (emphasis added).

71. **Alleviation of Allergy and Asthma Symptoms**

a. "By fully eliminating indoor air pollutants, **Molekule doesn't just offer noticeable relief to asthma and allergy sufferers but provides a safe living environment for everyone**." *Molekule Launches the World's First Molecular Air Purifier,* Molekule.com (May 24, 2016), *available at* https://assets.molekule.com/2016-05-24+-+Molekule+Launch.pdf (last visited November 17, 2020) (emphasis added).

b.  "Real People. Real Proof. Our beta trial was conducted on 28 participants including asthma and allergy sufferers. **After using Molekule, there was no difference in total symptom score between allergy and non-allergy sufferers. Results point to the potential for Molekule to immediately improve allergy sufferers quality of life**." Molekule.com/technology#trials (May 13, 2017) (emphasis added).

c.  "Goswami beta tested his Molekule air purifier with 30 testers across the country, **all of which he said saw tremendous health benefits**." Anastasia Dawson, *USF Engineer Invents Air Purifier to Combat Asthma, Allergies*, TAMPA BAY TIMES (May 28, 2016), *available at* https://www.tampabay.com/news/education/college/usf-engineer-invents-air-purifier-to-combat-asthma-allergies/2279374/ (last visited November 17, 2020) (emphasis added).

d.  Molekule also deployed testimonials from individuals and medical professionals touting the therapeutic benefit of the Air Purifiers.

e.  Chris Tashjian, "Family Physician," stated in a short video clip that: "I no longer take any antihistamines. I've gone from taking two to three a day down to taking zero." Facebook Ad

Library, Molekule Paid Advertisement (Beginning September 13, 2018) *available at* https://www.facebook.com/ads/library/?id=1837837282930176 (last visited November 17, 2020).

f. "'The unit has made a huge impact on my son's quality of life. For the first time waking up is not a battle, he's not fighting such congestion and is getting a good night sleep.' Jodie, Florida" Molekule.com (May 23, 2016)

g. "'The thing that surprised me was getting rid of my red eyes and sneezing. Now I'm free of that and I'm so happy!' Tanvir, New York" Molekule.com (May 23, 2016)

h. "'I had to visit the ER regularly. Its been eight months since I have been using Molekule's device, and I haven't been to the ER since.' Sandy, San Diego" Molekule.com (May 23, 2016)

i. "THE MOM Jodie French 'Molekule has significantly reduced my allergy symptoms. I no longer have constant sinus pressure and irritated eyes. But the biggest change was for my son, Peyton, who's no longer battling congestion and finally getting a good night's sleep!'" Molekule.com (May 13, 2017)

j. "THE DOCTOR Dr. Stephen Liggett Assoc. VP of USF Health 'As a pulmonologist who also suffers from asthma I was very impressed by the results I experienced after only a few weeks of using the Molekule device. Despite trying different

interventions and medications in the past, I was still experiencing many symptoms. But with Molekule, I finally felt less congestion, was not waking up with headaches in the morning, and had no nocturnal awakenings from my asthma. I feel that the technology holds great potential for future patients.'" Molekule.com (May 13, 2017).

k. "THE ALLERGY & ASTHMA SUFFERER Sandi Rosalia 'Before using Molekule I was going to the ER and my Allergist/Immunologist on a regular basis. It's been over a year and I haven't been back to the ER or to my doctor for my breathing treatments. Your product works and I feel so lucky to be part of the testing process.'" Molekule.com (May 13, 2017).

72. **Representations Regarding Wild Fires and Coronavirus.**

a. During the summer of 2018, while smoke generated by the Camp Fire wildfires rolled through Northern California, residents of the area noticed an uptick in Air Purifier advertising on their social media feeds. Sarah Emerson, *Startup Molekule Is Using the California Wildfires to Sell Its Crummy Air Purifier*, OneZero (October 29, 2019), *available at* https://onezero.medium.com/startup-molekule-is-using-the-california-wildfires-to-sell-its-crummy-air-purifier-6de052c9f773 (last visited November 17, 2020). Beginning in

August 2018, Molekule ran ads claiming that the Air Purifier was capable of neutralizing the pollution caused by the wildfires.

b.  For example, in text superimposed over an aerial view of a burning forest: "Molekule air purifier destroys pollutants and gaseous chemicals in wildfire smoke. Unlike traditional air purifiers, Molekule uses nanoparticles on a light-activated filter to completely destroy dangerous pollutants and particulate matter **leaving only pure air**." Facebook Ad Library, Molekule Paid Advertisement (Beginning August 24, 2018) *available                                                      at* https://www.facebook.com/ads/library/?id=261833251110177 (last visited November 17, 2020).

c.  Molekule has more recently attempted to capitalize on fear of the coronavirus.

d.  Co-founder and Chief Scientist Yogi Goswami declared: "I am very confident that this technology will destroy Coronavirus. Although we have not tested it on that virus itself, we have tested it on viruses of that type." Angelina Salcedo, *Tampa Bay professor might have the answer to stopping coronavirus*, WTSP.com   (Feb.   21,   2020),   *available      at* https://www.wtsp.com/article/news/health/tampa-bay-researcher-might-have-the-answer-to-stopping-

coronavirus/67-e91c5592-cc39-47b5-a4d9-aa1365c370a7

(last visited November 17, 2020). Mr. Goswami continued: "You would put the units in the room where you're concerned about. There's a fan in the unit which sucks air into the unit and the air that comes out comes out totally clean. So, this is not a cure, but it reduces the risk of infection." *Id.*

e. Jaya Rao, also a co-founder and the daughter of Mr. Goswami, told an interviewer that "Coronavirus is actually a rather simple structure for us to be able to be destroy." Hailey Waller, *This Air Purifier Maker Is Accelerating Tests on Coronavirus*, Bloomberg.com (February 23, 2020), *available at* https://www.bloomberg.com/news/articles/2020-02-23/this-air-purifier-maker-is-accelerating-tests-on-coronavirus (last visited November 17, 2020).

73.     Following the launch of the Molekule Air, Molekule's representations were largely repeated uncritically by multiple publications—but they did not hold up when examined. Multiple reputable organizations, including review publications like Consumer Reports and Wirecutter and industry watchdogs like the National Advertising Division have concluded that the Air Purifiers are not capable of effectively removing pollutants from the air or functioning as Defendant states.

**C.     Molekule's Representations Were False and Misleading**

74.     On October 31, 2019, Wirecutter, a New York Times-affiliated technology review publication, published a review and YouTube video that detailed the results of its testing and concluded "The Molekule is the worst performing air purifier that we have ever tested." Tim Heffernan, The Best Air Purifier, Wirecutter.com (May 13, 2020), *available at* https://thewirecutter.com/reviews/best-air-purifier/#molekule-the-worst-air-purifier-weve-ever-tested (last visited November 17, 2020); Tim Heffernan, Molekule: The Worst Air Purifier We've Ever Tested, Youtube.com (Oct. 31, 2019), *available at* https://www.youtube.com/watch?v=VM9CJZpqfpA (last visited November 17, 2020).

75.     Wirecutter's primary endeavor was to test Molekule's claim that: "Our scientifically-proven nanotechnology outperforms HEPA filters in every category of pollutant from well-known allergens like dust, pollen, and pet dander to microscopic pollutants like mold, viruses, bacteria, and gaseous chemicals." Tim Heffernan, The Best Air Purifier, Thewirecutter.com (Feb. 25, 2020), *available at* https://thewirecutter.com/reviews/best-air-purifier/#molekule-the-worst-air-purifier-weve-ever-tested (last visited November 17, 2020). To that end, the reviewer submitted a Molekule Air to a battery of standard tests in comparison with other air purifiers employing standard HEPA filter technology.

76.     According to the reviewer, "[t]he Molekule turned in the worst performance on particulates of any purifier, of any size, of any price, that we have tested in the seven years that we have been producing this guide." Disturbingly, the testing found that "unlike the HEPA purifiers, all of which proved capable of

deeply cleaning the air, the Molekule left the air heavily loaded with particulates on every setting." The review continues:

> At a certain point, these results look worse than what you see with no purifier running at all. In a pair of baseline background tests, which we use as a control measure, 0.3-micron particulate levels dropped by 13.9 and 15.3 percent on their own. That's due to settling, in which particles fall to a room's surfaces; agglomeration, in which two or more particles naturally combine to form a single particle; and ambient ventilation, which we standardized for all our tests. One possible reason the Molekule performed worse than background reduction is that its fan stirred up the air and kept particles from settling.

*Id.*

77.     Wirecutter subsequently updated its air purifier guide on February 25, 2020, to reflect that Molekule had removed from its website the false claim that "Our scientifically-proven nanotechnology outperforms HEPA filters in every category of pollutant from well-known allergens like dust, pollen, and pet dander to microscopic pollutants like mold, viruses, bacteria, and gaseous chemicals." *Id*.

78.     Consumer Reports, a consumer-oriented non-profit organization, published its own review of the Molekule on December 9, 2019. That review found that the Molekule "almost flunked" the standard array of tests that air purifiers are put through, declaring: "It is the third-

lowest-scoring air purifier of the 48 we tested." Perry Santanachote, *Does The Molekule Air Purifier Live Up To The Hype?*, Consumerreports.org (Dec. 9, 2019), *available at* https://www.consumerreports.org/air-purifiers/molekule-air-purifier-review/ (last visited November 17, 2020).

79.    Consumer Reports' testing showed that the Molekule was "not proficient at catching larger airborne particles"—which would include the pollutants Molekule claims to destroy—indicating that "it's not getting enough air passing through the system." *Id.* At high speed, the device received "a Fair rating for smoke and dust removal" and "a Poor—the lowest score possible—at low speed." *Id.*

80.    Additionally, Consumer Reports disputed Molekule's claim that the Molekule Air was rated for a room of up to 600 square feet:

> The manufacturer says the Molekule Air is sized for rooms up to 600 square feet, but its performance in our tests ranks it among compact models that are designed for small rooms. Based on our lab's calculated rate at which it can process the the air, the Molekule Air wouldn't be able to handle any room larger than 100 square feet.

*Id.*

81.    The Wirecutter and Consumer Reports findings were subsequently corroborated in private proceedings against Defendant. Dyson, Inc., a maker of competing air purifiers, initiated a proceeding before the National Advertising

Division ("NAD"), a Better Business Bureau affiliate organization that independently evaluates national advertising and enforces standards of truth and accuracy in advertising claims. Dyson challenged twenty-six claims made on Defendant's website, YouTube videos, and social media, in testimonials, and other online advertisements. Those claims fell into the following categories:

a. Claims that the Air Purifier, or the PECO technology, as deployed in the Air Purifier, "completely 'eliminates,' 'destroys,' or 'permanently removes' all indoor air pollution or any specific bioaerosol;"

b. Claims quantifying the Air Purifier performance, *e.g.*, claims such as a "specific bioaerosol was completely eliminated (reduced to 0%)" and that the Air Purifier "destroys 1 million allergens in 4 minutes;"

c. VOC elimination claims, including the claim that "Independent lab results have shown that PECO destroys VOCs quickly and efficiently";

d. Claims regarding the Air Purifier's performance in large rooms, such as "Made for large rooms. Molekule is able to completely replace the air in a 600 square foot room (large living room) once an hour;"

e. Claims by Molekule that its PECO technology is superior to HEPA technology; and

f.  Claims that the Air Purifier can provide allergy and asthma symptom relief.

82.    On October 25, 2019, the NAD issued a decision finding all twenty-six of Molekule's advertising claims to be unsubstantiated and recommending that they be withdrawn. For example, NAD concluded that Molekule had provided evidence that was "insufficiently reliable to provide a reasonable basis for" its claims regarding the efficacy of the Air Purifier and its ability to eliminate or destroy pollution, noting that the testing results submitted by Molekule called into question whether the Air Purifier would have the benefits claimed "under real-world conditions." *NAD Recommends Molekule Discontinue Pollution Elimination, Asthma and Allergy Symptom Relief Claims for its Molekule Home One Air Purifier; Advertiser to Appeal Certain Findings*, BBB National Programs Archive (Oct. 25, 2019) *available at* https://bbbprograms.org/archive/nad-recommends-molekule-discontinue-pollution-elimination-asthma-and-allergy-symptom-relief-claims-for-its-molekule-home-one-air-purifier-advertiser-to-appeal-certain-findings/ (last visited November 17, 2020). NAD also found that Molekule had provided evidence insufficient to "substantiate claims about product performance for either PECO or HEPA, or Molekule's comparative superiority claims of PECO versus HEPA . . . and recommended they be discontinued." *Id.*

83.    NAD also considered Molekule's claims (including those based on Defendant's own studies, independent testing, and testimonials from doctors and patients) regarding the therapeutic benefits of the Air Purifiers for allergies and asthma. Molekule targeted asthma sufferers with its advertising, making claims

such as:

> Real people. Real proof. Our beta trial was conducted on
> 28 participants including asthma and allergy sufferers.
> After using Molekule, there was no difference in total
> symptom score between allergy and non-allergy sufferers.
> Results point to the potential for Molekule to immediately
> improve allergy sufferers['] quality of life.

NAD determined that Molekule's allergy and asthma symptom relief claims, including the "Real people. Real Proof" claim, "and claims referencing (explicitly or implicitly) its Beta Trial and Expanded Study, were unsupported and recommended that they be discontinued." *Id.*

84.    NAD noted that Molekule did not provide important information on the two human studies it had conducted and found that both studies were insufficient basis for its claims, citing the small study populations and lack of blinding.  NAD also found that much of the "independent" research on which Molekule's claims relied was done either at a lab where Molekule's founder is a director or at a lab that the company sponsors. NAD also concluded that the evidence submitted by Molekule failed to "provide reliable support for the consumer and doctor testimonials containing allergy and asthma symptom relief claims . . . ." *Id.* [3]

---

[3]    For example, the "Real People. Real Proof" study was conducted by Dr. Nikhil G. Rao on a group of twenty eight participants. There was no blinding in the study and Dr. Rao is an interested party, as he "has been the chief medical advisor to Molekule . . .

85.     Molekule agreed to withdraw the majority of the challenged representations from its advertising but appealed NAD's findings regarding its pollution elimination statements (excluding claims regarding quantified pollution elimination) and claims to the comparative superiority of PECO technology over HEPA technology.

86.     On March 26, 2020, a panel of the National Advertising Review Board ("NARB"), the appellate body responsible for review of NAD decisions, issued a determination on Molekule's appeal. It upheld NAD's recommendation that "Molekule discontinue or modify certain non-quantified pollution elimination claims for [the Air Purifier], and discontinue the challenged comparative superiority claims versus air purifiers that contain HEPA filters." *NARB Finds Supported Claims by Molekule that the PECO Filter of its MH1 Air Purifier Can Address Bioaerosol and VOC Pollution; Recommends Discontinuance or Modification of Other Claims, Including Discontinuance of Superiority Claims vs. HEPA Filters*, BBB National Programs, Inc. (Mar 26, 2020), *available at* https://www.prnewswire.com/news-releases/narb-finds-supported-claims-by-molekule-that-the-peco-filter-of-its-mh1-air-purifier-can-address-bioaerosol-and-voc-pollution-recommends-discontinuance-or-modification-of-other-claims-including-discontinuance-of-superiority-clai-301030514.html (last visited November 17, 2020).

87.     Although NARB determined that Molekule had sufficiently supported

---

since its inception." Nikhil Rao, MD, ISEAI.org, *available at* https://iseai.org/nikhil-rao-md/ (last visited November 17, 2020).

its claim that PECO technology as deployed in the Air Purifier "can address bioaerosol and VOC pollution" and that the Air Purifiers can "destroy[] pollutants at the molecular level," the panel agreed with NAD's previous conclusions regarding Molekule's claims of superiority over HEPA and claims that the Air Purifier "removes or destroys all pollutants in a room or completely eliminates such pollutants." *Id.* NARB recommended that Molekule discontinue all such claims, and "Molekule stated that it will comply with the panel's recommendations." *Id.*

## D.     Plaintiffs and Class Members Relied on Molekule's False Representations

88.     Defendant's misrepresentations and false statements were woven into an extensive and long-term advertising campaign that began on or before the launch of the Air Purifiers in May of 2016. Defendant spent at least hundreds of thousands of dollars—likely millions—to spread misrepresentations and material omissions about the Air Purifiers through its own website, social media, interviews with traditional media, YouTube, and other fora

89.     Molekule and its founders authored these false and misleading representations and propagated them through various outlets, including through third party publications who repeated Molekule's claims without question. Molekule's intent was to cause a "buzz" that would attract customers and construct a veneer of credibility around their falsehoods. They largely succeeded.

90.     These misleading ads were viewed by millions and drove sales of Air Purifiers across the country. As described above, Plaintiffs first saw Defendant's

wildfire-related advertisements in 2018 and found compelling Defendant's representation that the Air Purifier would "completely destroy dangerous pollutants and particulate matter leaving only pure air." Facebook Ad Library, Molekule Paid Advertisement (Beginning August 24, 2018) *available at* https://www.facebook.com/ads/library/?id=261833251110177 (last visited November 17, 2020). This was false. The Air Purifiers have been proven ineffective at removing particulates from the air and would not be able to "leav[e] only pure air."

91.     Plaintiffs were familiar with Defendant's representations regarding the superiority of its PECO filters over HEPA filters. This was a critical selling point for them, as they hoped to purchase the most effective air purifier available. And this was a core theme in Defendant's advertising, at least until Wirecutter published its test results showing that the Air Purifiers are dramatically less effective than comparable HEPA air purifiers. After that review was released Defendant removed this claim from its website. But, by that point, Plaintiffs and class members had seen these false claims and purchased Air Purifiers in reliance on them.

92.     Plaintiffs also believed, based on his familiarity with Defendant's claims, that the Air Purifiers would eliminate airborne allergens indoors and thereby completely ameliorate allergy symptoms. This claim is also false or, at the very least, made recklessly and without substantiation. NAD considered evidence submitted by Molekule in support of its allergy and asthma symptom relief claims and concluded that Molekule had failed to "provide reliable support for the

consumer and doctor testimonials containing allergy and asthma symptom relief claims . . . ." *NAD Recommends Molekule Discontinue Pollution Elimination, Asthma and Allergy Symptom Relief Claims for its Molekule Home One Air Purifier; Advertiser to Appeal Certain Findings*, BBB National Programs Archive (Oct. 25, 2019) *available at* https://bbbprograms.org/archive/nad-recommends-molekule-discontinue-pollution-elimination-asthma-and-allergy-symptom-relief-claims-for-its-molekule-home-one-air-purifier-advertiser-to-appeal-certain-findings/ (last visited November 17, 2020). Moreover, this claim is contradicted by the fact the Air Purifiers are ineffective at removing particulates—like allergens—from the air.

93.     One critical factor in some class members' decision to purchase an Air Purifier was his belief that it could protect them from coronavirus. Many saw Defendant's claims regarding the ability of Air Purifiers kill ninety-nine per cent of viruses, a claim which Molekule began making as early as 2016. Many also read an interview with Jaya Rao, co-founder of Molekule, which described Ms. Rao receiving a "warm welcome" from passengers "freaked out about all this viral stuff" when she plugged in an Air Purifier for use on a cross-country flight. After detailing Defendant's purported efforts to test the ability of the Air Purifiers to kill coronavirus, Ms. Rao asserted that "Coronavirus is actually a rather simple structure for us to be able to be destroy." Hailey Waller, *This Air Purifier Maker Is Accelerating Tests on Coronavirus*, Bloomberg.com (February 23, 2020), *available at* https://www.bloomberg.com/news/articles/2020-02-23/this-air-purifier-maker-is-accelerating-tests-on-coronavirus (last visited November 17,

2020). Based on this interview and Molekule's claims regarding the abilities of the Air Purifiers, many reasonably believed that an Air Purifier could serve as an effective prophylactic against coronavirus. They were not aware that Molekule's statements were false and/or misleading, as they were based on testing conducted by interested parties and/or under highly controlled conditions that do not mimic the actual operating environment in which an Air Purifier operates. Additionally, Molekule has admitted that it has not conducted such testing on the Covid-19 virus but only on "proxy viruses." *Id.*

94.     The members of the Class also relied on various other misrepresentations and material omissions made by Molekule in purchasing Air Purifiers. Many class members were impressed by Molekule's claims that the Air Purifiers are capable of achieving quantified benchmarks (for example, that an Air Purifier "destroys 1 million allergens in 4 minutes"), which were typically communicated graphically. But, as confirmed in the NAD proceeding, these claims are misleading as they are the results of controlled test conditions and have little relevance to the capabilities of the Air Purifiers when operating in the real world.

95.     Nearly all types of Molekule's claims were bolstered by Molekule's assertion it was communicating the results of "independent testing," and many class Members found this compelling. But it is now clear that these tests were anything but independent as they were conducted by parties connected to Defendant and were critically flawed.

96.     Finally, Defendant has claimed from the launch of the Air Purifiers that the devices are capable of performing in rooms of up to a certain size—600

square feet for the Molekule Air, and 250 square feet for the Air Mini and Air Mini+. Plaintiffs and members of the Class relied on these representations in choosing to purchase the Air Purifiers, but these claims are also false. Consumer Reports found that the Molekule Air would be capable of effectively cleaning a room of no more than 100 square feet, an 84 per cent reduction in performance capability.

97.     Defendant amplified their misrepresentations in many venues over a multi-year period with the intent to instill in consumers the belief that the Air Purifiers were vastly superior to existing technology and capable of completely eradicating pollutants and other undesirable particles from indoor spaces. Plaintiffs and the members of the Class saw these claims and relied on them in purchasing the Air Purifiers, believing that they were buying the best air purifiers available when in fact they were purchasing air purifiers that are largely ineffective.

**E.     Molekule Concealed the Defect in the Air Purifiers**

98.     Molekule designed, manufactured, marketed, and sold Air Purifiers across the United States while knowingly concealing the Defect in the Air Purifiers.

99.     As described by Wirecutter and Consumer Reports testing and reviews, and the findings of NAD and NARB, the Air Purifiers are incapable of performing as advertised. The Air Purifiers are unable to clean air at anywhere near the efficacy claimed by Defendant, perform substantially worse than competing air purifiers, especially those utilizing HEPA filters, and do not offer the therapeutic benefits claimed by Molekule. Consequentially, Molekule's claims

regarding the performance, capabilities, and therapeutic benefits of the Air Purifiers were false and misleading.

100.   Defendant's claims were material to Plaintiffs and the members of the Class but Molekule did not disclose to purchasers of the Air Purifiers that the devices were defective and unable to fulfill many of Molekule's advertising claims. As a result, Plaintiffs and the members of the class purchased devices that they would not have otherwise purchased or for which they would have paid less. Many members of the Class relied on Defendant's assertions that the Air Purifiers was capable of producing specific outcomes—*e.g.*, reducing asthma and allergy symptoms or "completely eliminating the full spectrum of indoor pollutants"—and received devices that were unfit for the purposes for which they were purchased.

101.   Defendant's greed-driven scheme won the company acclaim, sales, and nearly a hundred million dollars in venture capital investments at the expense of Plaintiffs and Class members across the country and in violation of applicable law.

## CLASS ACTION ALLEGATIONS

102.   Plaintiffs bring this lawsuit on behalf of himself and all similarly situated individuals and entities, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4). Specifically, the classes consist of:

**Nationwide Class**

All persons in the United States who purchased an Air Purifier.

**California Subclass**

All persons in the state of California who purchased an Air Purifier.

### Massachusetts Subclass

All persons in the state of Massachusetts who purchased an Air Purifier.

### Michigan Subclass

All persons in the state of Michigan who purchased an Air Purifier.

### Wildfire Subclass

All persons in a county with at least one property at high or extreme risk from wildfire, as classified by Verisk Analytics.

103.   The California, Massachusetts, and Michigan Subclasses are referred to herein as the "State Subclasses." The Nationwide Class, State Subclasses, and Wildfire Subclass are together referred to herein as the "Class." Excluded from the Class are: (a) any Judge presiding over this action and members of their immediate families; (b) Defendant and their subsidiaries and affiliates; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

104.   **Numerosity**: The Class is comprised of thousands of owners of Air Purifiers, making joinder of all Class members impractical. Moreover, the Class is composed of an easily ascertainable, self-identifying set of individuals and entities that purchased Air Purifiers. The precise number of Class members can be ascertained through discovery, which includes Molekule's records. The disposition of their claims through a class action will benefit both the parties and this Court.

105.  **Commonality**: There are questions of law and fact common to the Class that will materially advance the litigation, and these common questions predominate over any questions affecting only individual Class members.  Among the questions common to the Class are:

a.      Whether the PECO filter or Air Purifiers are defective;

b.      The origins and implementation of, and the justifications for, if any, Molekule's policies and technology relating to the Defect and its manifestation in the Air Purifiers;

c.      Whether Air Purifiers are plagued by a defect(s) that causes them to purify the air far less effectively than advertised;

d.      When Molekule became aware of the Defect in the Air Purifiers and how it responded to that knowledge;

e.      Whether Molekule actively concealed and/or failed to notify consumers of the Defect in the Air Purifiers;

f.      Whether Defendant knew of these issues but failed to disclose the problems and their consequences to their customers;

g.      Whether a reasonable consumer would consider the Defect and its consequences to be material;

h.      Whether Defendant's conduct violates state consumer protection laws as asserted herein;

i.  Whether Defendant's sale of defective Air Purifiers is unfair, false, misleading, or deceptive acts in the conduct of any trade or commerce;

j.  Whether Plaintiffs and the other Class members overpaid for their Air Purifiers as a result of the Defect alleged herein;

k.  Whether Plaintiffs and Class Members would have purchased their Air Purifiers, and whether they would have paid a lower price for them, had they known that they contained the Defect and were unable to effectively remove pollutants from the air at the time of purchase;

l.  Whether Plaintiffs and the Class are entitled to compensatory damages, including, among other things: (i) compensation for all out-of-pocket monies expended by members of the Class for replacement or repair of the Air Purifiers and filter replacement; and (ii) the failure of consideration in connection with and/or difference in value arising out of the variance between the Air Purifiers as merchantable and, and as actually manufactured and sold possessing the Defect; and

m.  Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief.

106.   **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class, as all such claims arise out of Defendant's conduct in designing, manufacturing, marketing, advertising, warranting, and selling the Air Purifiers. All of Plaintiff's claims are typical of the claims of the Class since Plaintiffs and all Class members were injured in the same manner by Defendant's uniform course of conduct described herein.  Plaintiffs and all Class members have the same claims against Defendant relating to the conduct alleged herein, and the same events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all Class members.  Plaintiffs and all Class members sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct as described herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

107.   **Adequate Representation**: Plaintiffs will fairly and adequately protect the interests of the Class members and have no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions including, but not limited to, consumer class actions involving, *inter alia*, breach of warranties, product liability, product design defects, and state consumer fraud statutes.

108.   **Predominance**: This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members.

109.   **Superiority**: A class action is superior to other available methods for

the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable. Should individual Class Members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

## ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

110. Defendant has possessed exclusive knowledge about the defect, including from its customer complaint and warranty records, internal emails, reports, analyses, and assessment of product designers, that is unavailable to Plaintiffs and the proposed class members.

111. Defendant is estopped from relying on any statutes of limitation or repose due to its acts of concealment. Defendant knew about the defect for years but concealed it and/or failed to alert purchasers or potential purchasers. Defendant maintained exclusive control over information concerning the known, but non-public, defect and the number of Air Purifiers at issue; Plaintiffs and class members, therefore, could not reasonably have known about the defect or the number of Air Purifiers affected.  Defendant is estopped from relying on any statutes of limitations or repose that might otherwise apply to the claims asserted

herein.

## CAUSES OF ACTION

### COUNT I

**DECEIT AND FRAUDULENT CONCEALMENT**

**(On Behalf of the Nationwide Class or, in the alternative, the State Subclasses)**

112.    Plaintiffs repeat and realleges the above allegations as if fully set forth herein.

113.    Plaintiffs assert this claim on behalf of the Nationwide Class. In the alternative, this claim is brought on behalf of the State Subclasses.

114.    Defendant made false representations concerning the performance and quality of the Air Purifiers, and the quality of the Defendant's brand. Further, Defendant concealed and suppressed material facts concerning the performance and quality of the Air Purifiers, the quality of the Defendant's brand, the Air Purifiers' capabilities and benefits, and the Defect. Defendant knew, or in the exercise of reasonable diligence should have known, of the Defect and misrepresentations of the capabilities and benefits of the Air Purifiers, but failed to disclose these facts prior to or at the time it marketed Air Purifiers and sold them to consumers. Defendant engaged in this concealment in order to increase sales of its Air Purifiers and command a higher price for tis Air Purifiers.

115.    Plaintiffs and class members had no reasonable way of knowing that Defendant's representations were false and misleading, or that Defendant had omitted to disclose highly important details relating to the Air Purifiers'

performance and the Defect. Plaintiffs and class members did not and could not reasonably discover Defendant's deception on their own.

116.   Defendant had a duty to disclose the true performance of the Air Purifiers because the scheme and its details were known and accessible only to Defendant; Defendant had superior knowledge and access to the relevant facts; and Defendant knew these facts were neither known to, nor reasonably discoverable by, Plaintiffs and the class members.

117.   Defendant still has not made full and adequate disclosures and continue to defraud consumers by concealing material information regarding the true performance of Air Purifiers.

118.   Plaintiffs and class members were unaware of the omitted material facts and would not have purchased the Air Purifiers had they known of the facts Defendant suppressed. Plaintiffs and class members' actions in purchasing Air Purifiers were justified. Defendant was in exclusive control of the material facts and such facts were not reasonably known to the public, Plaintiffs, or class members.

119.   Plaintiffs and class members relied to their detriment upon Defendant's representations, fraudulent misrepresentations, and material omissions regarding the quality of Air Purifiers, the Air Purifier' effectiveness, and the Defect in deciding to purchase their devices.

120.   Plaintiffs and class members sustained damage as a direct and proximate result of Defendant's deceit and fraudulent concealment. Among other damages, Plaintiffs and class members did not receive the value of the premium

price they paid for their Air Purifiers. Plaintiffs and class members would not have purchased Air Purifiers, or would have purchased them at a much lower price, had they known of the Air Purifiers' inability to effectively remove particulates from the air owing to the Defect.

121.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and class members' rights and well-being, to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II

## BREACH OF EXPRESS WARRANTY

## (On Behalf of the Nationwide Class or, in the alternative, the State Subclasses)

122.   Plaintiffs repeat and realleges the allegations above as if fully set forth herein.

123.   Plaintiffs bring this claim on behalf of the Nationwide Class. In the alternative, this claim is brought on behalf of the State Subclasses, pursuant to their respective state provisions of the Uniform Commercial Code ("U.C.C.").[4]

124.   Defendant is a "merchant" and "seller" as those terms are

---

[4] *See, e,g.,* Cal. Comm. Code §§ 2313, 10210; Mich. Comp. Laws § 440.2313; Mass. Ann. Laws ch. 106, § 2-313, 2A-210.

defined under the Uniform Commercial Code ("U.C.C.") and by the respective state statutes under which Plaintiffs alternatively pleads this claim, *e.g.*, Cal. Comm. Code §§ 2103 and 2104.

125.   Plaintiffs and the class members were "buyers" of "goods" as defined under the U.C.C. and by the respective state statutes under which Plaintiffs alternatively asserts this claim.

126.   Defendant created an express warranty within the meaning of the U.C.C. and the respective state statutes under which Plaintiffs alternatively assert this claim.

127.   In particular, Plaintiffs, and those similarly situated, who purchased an Air Purifier received materially similar, if not identical, written warranties from Defendant. The Air Purifiers' written warranties state, in pertinent part, in similar or identical terms, as follows:

> Molekule warrants that for a period of two years from shipment, the Product will be free from defects in materials and workmanship under normal use in accordance with the documentation provided with the Product. . . . Molekule's sole obligation under this warranty will be at its option to repair or replace the Product and the replaced product will be warranted for the remaining period of the original warranty.

*Product Limited Warranty*, Molekule.com, available at https://molekule.com/returns-and-warranty (last visited November 17, 2020).

128.   At all relevant times, including prior to and at the time of their purchases of Air Purifiers, Plaintiffs and class members relied on Defendant's claims, promises, and representations. These promises were part of the basis of the bargain connected with these transactions for the sale of goods, and thus qualify as "express warranties" as defined by the U.C.C.

129.   Defendant breached its express warranty by:

    a.   selling Plaintiffs and class members Air Purifiers that were unable to effectively remove particulates from the air after representing that the Air Purifiers use the "only technology that eradicates the full spectrum of indoor air pollutants" and "completely eliminate[] even the most microscopic pollutants."

    b.   selling Plaintiffs and class members Air Purifiers containing defective materials responsible for the Defect, which caused the Air Purifiers to fail to function properly; and

    c.   failing to adequately repair or replace Air Purifiers affected by the Defect.

130.   Defendant did not furnish an effective remedy to Plaintiffs and Class members. Despite opportunities to honor the promises in its express warranty, Defendant failed to provide Plaintiffs and Class members with conforming Air Purifiers free of defects and failed to repair the Air Purifiers to make them conform to the representations made at the time of sale.

131.   Plaintiffs and class members experienced the Defect within the warranty period. In breach of its express warranty, Defendant failed to inform Plaintiffs and class members that the Air Purifiers contained

defective materials and workmanship and failed to replace or repair the defective Air Purifiers.

132.   Defendant breached its express warranty that promised to replace or repair and correct manufacturing, materials or workmanship defects, and to provide Air Purifiers conforming to the warranty. To date, Defendant has not replaced nor repaired or adjusted the Air Purifiers, and has been unable to repair or adjust, the Defect in the Air Purifiers.

133.   Through advertisements, public statements, and other statements disseminated through print and online media, Defendant expressly warranted several attributes and qualities of the Air Purifiers by representation as detailed above, such as:

      a.  "Our scientifically-proven nanotechnology outperforms HEPA filters in every category of pollutant."

      b.  "[PECO is] the only technology that eradicates the full spectrum of indoor air pollutants."

      c.  "[An Air Purifier] could 100 percent disinfect the air completely."

      d.  "[an Air Purifier] completely eliminates even the most microscopic pollutants"

      e.  "Molekule doesn't just offer noticeable relief to asthma and allergy sufferers but provides a safe living environment for everyone."

134.   Class members were exposed to and relied on the foregoing statements when they decided to buy the Air Purifiers. Accordingly,

Defendant's express warranties formed part of the basis of the bargain that was reached when Plaintiffs and class members purchased their Air Purifiers.

135.   Defendant breached these express warranties because the Air Purifiers did not, in fact, "outperform[] HEPA filters in every category of pollutant," "eradicate[] the full spectrum of indoor air pollutants," or "offer noticeable relief to asthma and allergy sufferers." Defendant failed to adequately repair or replace Plaintiffs' and Class members' Air Purifiers when they reported that they suffered from the Defect during the warranty period. Despite reasonable opportunities to honor the promises in their express warranties, Defendant failed to provide Plaintiffs and class members with conforming, non-defective Air Purifiers.

136.   Defendant received timely notice of the breaches experienced by Plaintiffs and class members. Defendant had exclusive knowledge of the Defect before the Air Purifiers were sold. Defendant also received notice of the Defect by the large volume of complaints lodged by consumers about the Defect shortly after the product was publicly. These complaints were received directly from consumers as well as from vendors who sold the Air Purifiers who received the complaints and relayed them to Defendant.

137.   Plaintiffs and class members used their Air Purifiers in a manner consistent with the Air Purifiers' operating instructions. Plaintiffs and class members performed their duties under the terms of the foregoing express warranties or have been excused from such performance as a result of Defendant's conduct described herein.

138.   Any attempt by Defendant to disclaim or limit their express warranties vis-à-vis consumers would be inappropriate under these circumstances. Any such asserted limitation is unconscionable and unenforceable because Defendant knowingly sold a defective product without informing consumers and because Defendant failed to honor their express promises.

139.   As a direct and proximate result of Defendant's breaches of express warranty, Plaintiffs and class members have suffered economic damages, including costly repairs, loss of use, replacement costs, substantial loss in value and resale value of the Air Purifiers, and other harm.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

**(On Behalf of the Nationwide Class or, in the alternative, the State Subclasses)**

140.   Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

141.   Plaintiffs assert this claim on behalf of the Nationwide Class. In the alternative, this claim is brought on behalf of the State Subclasses.[5]

142.   Defendant is a "merchant" as defined under the U.C.C. and by the respective state statutes under which Plaintiffs alternatively assert this

---

[5] *See* Cal. Com. Code §§ 2314, 10212; Mass. Ann. Laws ch. 106, § 2-314, 2A-212; Mich. Comp. Laws § 440.2314, § 440.2315.

claim.

143.   The Air Purifiers are "goods" as defined under the U.C.C. and by the respective state statutes under which Plaintiffs alternatively bring this claim, including for Plaintiffs Apaliski and Waterman under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1790, *et seq.* and the Consumer Legal Remedies Act, Cal. Civ. Code § 1761(a).

144.   Defendant impliedly warranted that the Air Purifiers were of a merchantable quality. The law implies a warranty that the Air Purifiers were merchantable in the relevant transactions. The Air Purifiers, when sold and at all times thereafter, were not in merchantable condition due to the Defect and other conditions as alleged above and are not fit for the ordinary purpose for which air purifiers are used, *e.g.*, to remove particulate matter from the air.

145.   At the point of sale, the Air Purifiers contained unseen manufacturing or materials defects whose manifestation renders the product ineffective. These defects in the Air Purifiers existed when the Air Purifiers left Defendant's possession and rendered them unfit for their ordinary and intended purpose. At all relevant times, including when the Air Purifiers entered the stream of commerce and were purchased by Plaintiffs and Class members, the Air Purifiers were defective and not capable of functioning as advertised.

146.   Defendant breached the implied warranty of merchantability because the Air Purifiers are not of a merchantable quality, but instead contained the Defect. Had Plaintiffs and class members known of the Defect

they would not have purchased their Air Purifiers, or would have paid less for them.

147.   Plaintiffs and class members' interactions with Molekule suffice to create privity of contract between Plaintiffs and class members, on the one hand, and Defendant, on the other hand; however, privity of contract need not be established nor is it required because Plaintiffs and class members are intended third party beneficiaries of contracts (including implied warranties) between Molekule and the retailers who sell the Air Purifiers. Defendant's warranties were designed for the benefit of consumers who purchase(d) Air Purifiers.

148.   As a direct and proximate result of the breach of said warranties, Plaintiffs and Class members were injured and are entitled to damages.

149.   Defendant's attempts to disclaim or limit the implied warranty of merchantability vis-à-vis consumers are unconscionable and unenforceable. Specifically, Defendant's warranty limitations are unenforceable because Defendant knowingly sold a defective product without informing consumers about the Defect.

150.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and members of the Class had no meaningful choice in determining these time limitations, terms which unreasonably favor Defendant. A gross disparity in bargaining power existed between Defendant and Class members, as only Defendant knew or

should have known that the Air Purifiers were defective at the time of sale and that the devices were not of merchantable quality.

151.   Plaintiffs and Class members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

152.   Defendant was provided notice of these issues. Defendant had exclusive knowledge of the Defect before the Air Purifiers were sold. Defendant also received notice of the Defect by the large volume of complaints lodged by consumers about the Defect shortly after the product was publicly. These complaints were received directly from consumers as well as from vendors who sold the Air Purifiers who received the complaints and relayed them to Defendant.

153.   Prior to the filing of this Complaint, Plaintiffs' counsel sent a pre-suit notice letter concerning the Defect, consumers' experiences with the Defect and their intention to file the instant complaint on behalf of consumers alleging a breach of the implied warranty of merchantability on behalf of the Nationwide Class.

154.   Defendant's breach of the implied warranty of merchantability damaged Plaintiffs and Class members in an amount to be determined at trial.

## COUNT IV
## VIOLATIONS OF THE MAGNUSSON-MOSS WARRANTY ACT, 15 U.S.C. §§ 2301 *et seq.* ("MMWA")

**(On Behalf of the Nationwide Class or, in the alternative, the State**

**Subclasses)**

155.   Plaintiffs repeat and realleges the above allegations as if fully set forth herein.

156.   Plaintiffs assert this claim on behalf of the Class. In the alternative, this claim is brought on behalf of the State Subclasses.

157.   Plaintiffs and class members are "consumers" within the meaning of the MMWA. 15 U.S.C. § 2301(3).

158.   The Air Purifiers are "consumer products" within the meaning of the MMWA. 15 U.S.C. § 2301(1).

159.   Molekule is a "supplier" and "warrantor" within the meaning of the MMWA. 15 U.S.C. § 2301(4)-(5).

160.   Defendant's express warranties are written warranties within the meaning of Section 2301(6) of the MMWA. The Air Purifiers' implied warranties are accounted for under Section 2301(7) of the MMWA. Defendant cannot disclaim implied warranties under the MMWA because Defendant knowingly sold a defective product without informing consumers about the defects.

161.   As set forth herein, Molekule breached its warranties with Plaintiffs and class members. Additionally, 15 U.S.C. § 2304(d) provides in pertinent part:

> [T]he warrantor may not assess the consumer for any costs the
>
> warrantor or his representatives incur in connection with the required

remedy of a warranted consumer product. . . . [I]f any incidental expenses are incurred because the remedy is not made within a reasonable time or because the warrantor imposed an unreasonable duty upon the consumer as a condition of securing remedy, then the consumer shall be entitled to recover reasonable incidental expenses which are so incurred in any action against the warrantor. *Id.*

162.   The Air Purifiers share a common defect in that they are unable to effectively remove particulates from the air and otherwise fail to satisfy Defendant's advertising claims.

163.   Despite notice by Plaintiffs and the Class to Molekule of the defective nature of the Air Purifiers, Molekule did not replace or repair the defective Air Purifiers. Instead, the costs of the Defect were borne by consumers.

164.   As a direct and proximate result of Molekule's breach of implied and express warranties pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs and class members have suffered damages in an amount to be proven at trial.

165.   At least one of the Plaintiffs and the other class members would suffer economic hardship if they returned their Air Purifiers but did not receive the return of all payments made by them. Because Molekule is refusing to acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs and the other class members have not reaccepted their Air Purifiers by retaining them.

166.   The amount in controversy for each Plaintiffs' and class

members' individual claims meets or exceeds the sum of $25. The total amount in controversy of this action in sum exceeds $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

167.   Plaintiffs and class members are entitled to recover damages as a result of Defendant' breach of warranties.

168.   Plaintiffs and class members are also entitled to seek costs and expenses, including attorneys' fees, under the MMWA. 15 U.S.C. § 2310(d)(2).

## COUNT V

## BREACH OF THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

### (On Behalf of the Wildfire Subclass)

169.   Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

170.   Plaintiffs Apaliski and Waterman bring this claim on behalf of the Wildfire Subclass.

171.   Molekule is a "merchant" as defined under the UCC.

172.   The Air Purifiers are "goods" as defined under the UCC.

173.   Molekule engaged in a concerted marketing campaign to consumers concerned about air quality from wildfire smoke and has reason to know that Plaintiffs Apaliski and Waterman and Wildfire Subclass members purchased the Air Purifiers for a particular purpose, *e.g.*, to remove airborne pollutants from the

air in order to improve air quality that was reduced by the presence of wildfire smoke, and that Plaintiffs Apaliski and Waterman relied on Molekule's skill or judgment to furnish devices that accomplished that purpose and others.

174.   Plaintiffs did in fact rely on Molekule's skill or judgment to furnish devices that accomplished that purpose and others

175.   Molekule breached the implied warranty of fitness because the Air Purifiers were incapable of satisfying that purpose, among others, due to the Defect and other conditions as alleged above.

176.   Plaintiffs were harmed by Molekule's breach of the implied warranty of fitness by, *inter alia*, overpaying for the Air Purifiers.

177.   Plaintiffs and Class members' interactions with Molekule suffice to create privity of contract between Plaintiffs and Class members, on the one hand, and Defendant, on the other hand; however, privity of contract need not be established nor is it required because Plaintiffs and Class members are intended third party beneficiaries of contracts (including implied warranties) between Molekule and the retailers who sell the Air Purifiers. Defendant's warranties were designed for the benefit of consumers who purchase(d) Air Purifiers.

178.   As a direct and proximate result of the breach of said warranties, Plaintiffs and Class members were injured and are entitled to damages.

179.   Defendant's attempts to disclaim or limit the implied warranty of fitness vis-à-vis consumers are unconscionable and unenforceable. Specifically, Defendant's warranty limitations are unenforceable because Defendant knowingly sold a defective product without informing consumers about the Defect.

180.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and members of the Class had no meaningful choice in determining these time limitations, terms which unreasonably favor Defendant. A gross disparity in bargaining power existed between Defendant and Class members, as only Defendant knew or should have known that the Air Purifiers were defective at the time of sale and that the devices were not of merchantable quality.

181.   Plaintiffs and Class members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

182.   Defendant was provided notice of these issues by complaints lodged by consumers before or within a reasonable amount of time after the allegations of the Defect became public.

183.   Prior to the filing of this Complaint, Plaintiffs' counsel sent a pre-suit notice letter concerning the Defect, consumers' experiences with the defect and their intention to file a complaint alleging all claims arising from this conduct, including breach of implied warranty.

## COUNT VI

## VIOLATIONS OF THE CALIFORNIA CONSUMERS

## LEGAL REMEDIES ACT

## (Cal. Bus. & Prof. Code § 1750, et seq.) ("CLRA")

**(On Behalf of the California Subclass)**

184.   Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

185.   Plaintiffs Apaliski and Waterman bring this Count individually and on behalf of the California Subclass.

186.   The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale of goods or services to any consumer."

187.   The Air Purifiers are "goods" as defined in Cal. Bus. & Prof. Code § 1761(a).

188.   Plaintiffs and the members of the California Subclass are "consumers" as defined in Cal. Bus. & Prof. Code § 1761(d), and Plaintiffs, the members of the California Subclass, and Defendant are "persons" as defined in Cal. Bus. & Prof. Code § 1761(c).

189.   As alleged above, Defendant made numerous false and misleading representations and material omissions concerning the benefits, performance, and capabilities of the Air Purifiers. In purchasing the Air Purifiers, Plaintiffs and the other the members of the California Subclass were deceived by Defendant's failure to disclose that the Air Purifiers are defective and not effective at improving air quality affected by wildfire smoke.

190.   Defendant's conduct, as described herein, was and is in violation of the CLRA. Defendant's conduct violates at least the following enumerated CLRA provisions: (a) § 1770(a)(2): Misrepresenting the approval or certification of

goods; (b) § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have; (c) § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another; (d) § 1770(a)(8): Disparaging the goods, services, or business of another by false or misleading representation of fact; (e) § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and (f) § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

191.   Plaintiffs and the members of the California Subclass have suffered injury in fact and actual damages resulting from Defendant's material omissions and misrepresentations because, *inter alia*, they lost money when they purchased their Air Purifiers, paid an inflated purchase price for the Air Purifiers, and/or later expended sums of monies to repair their defective Air Purifiers and/or replace filters.

192.   Defendant knew, should have known, or were reckless in not knowing, that the Defect in the Air Purifiers rendered them not suitable for their intended use.

193.   Defendant had a duty to disclose these issues because Molekule had exclusive knowledge of the defect prior to making sales of Air Purifiers, and because Defendant made partial representations about the quality of the Air Purifiers but failed to fully disclose their defect.

194.   The facts concealed and omitted by Defendant to Plaintiffs and the members of the California Subclass—that the Air Purifiers are defective—are

material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Air Purifiers or pay a lower price. Had Plaintiffs and the members of the California Subclass known about the defective nature of the Air Purifiers, they would not have purchased their Air Purifiers, or would not have paid the prices they paid.

195.   This cause of action seeks injunctive relief and monetary damages. Plaintiffs' counsel sent demand letters to Defendant via certified mail on or about May 20, 2020 and August 8, 2020 pursuant to the requirements of the CLRA in order to provide the notice required by Cal. Civ. Code § 1782(a).  The CLRA letters advised Defendant that it is in violation of the CLRA and must correct, replace or otherwise rectify the goods alleged to be in violation of Cal. Civ. Code § 1770. Defendant was further advised therein that in the event the relief requested was not provided within thirty days, Plaintiffs would file a complaint to include a request for monetary damages pursuant to the CLRA. Over thirty days have now passed, and Defendant did not correct, replace, or otherwise rectify the goods and issues alleged in the CLRA notice or this complaint within the statutorily prescribed 30-day period. Plaintiffs therefore seek both injunctive relief and monetary damages against Defendant pursuant to the CLRA, Cal. Civ. Code §§ 1781 and 1782.

196.   Plaintiffs further seek an order awarding costs of court and attorneys' fees pursuant to Cal. Civ. Code § 1780(e).

197.   Plaintiffs Apaliski and Waterman's CLRA venue declarations are attached hereto as Exhibit 1 in accordance with Cal. Civ. Code §§ 1780(d).

## COUNT VII

**VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW**

**(Cal. Bus. & Prof. Code §17500, *et seq.*)**

**(On Behalf of the California Subclass)**

198.   Plaintiffs repeat and reallege the above allegations as if fully set forth herein

199.   Plaintiffs Apaliski and Waterman bring this Count individually and on behalf of the California Subclass.

200.   Defendant's acts and practices as described herein have deceived and/or are likely to deceive Plaintiffs and Class members.  Defendant engaged in public advertising and marketing that made material misrepresentations and omissions regarding the performance and benefits of the Air Purifiers.  Such advertisements deceived and continue to deceive the consuming public for the reasons detailed above.

201.   In marketing the Air Purifiers and failing to disclose the Defect, Defendant knew or should have known that their representations and omissions were misleading.

202.   Defendant intended Plaintiffs and Class members to rely upon the advertisements and numerous material misrepresentations as set forth more fully elsewhere in the Complaint.  In fact, Plaintiffs and Class members did rely upon the advertisements and misrepresentations to their detriment.

203.   As a result of Defendant's misrepresentations and omissions, Plaintiffs and the Class suffered real financial damages.

204.   Pursuant to the CFAL, Plaintiffs and the Class seek an order or judgment as necessary to restore any monies acquired by unfair competition, including restitution and/or disgorgement, rescission and/or any other relief that this Court deems proper.

## COUNT VIII

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code § 17200, et seq.) ("UCL")

### (On Behalf of the California Subclass)

205.   Plaintiffs repeat and allege the above allegations as if fully set forth herein

206.   Plaintiffs Apaliski and Waterman bring this Count individually and on behalf of the California Subclass.

207.   The UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

208.   Defendant's conduct, as described herein, was and is in violation of the UCL. Defendant's conduct violates the UCL in at least the following ways: (a) knowingly and intentionally concealing from Plaintiffs and the members of the California Subclass the existence of the Defect in the Air Purifiers; (b) marketing the Air Purifiers as being functional and not possessing a defect that would render them unable to perform as Defendant claimed; and (c) violating other California laws, including California laws governing false advertising and consumer

protection.

209.   Defendant's acts and omissions are unfair in that they (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers.  Defendant has, through knowing, intentional, material omissions, concealed the true defective nature of the Air Purifiers.

210.   Defendant's acts and omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are injuries of a nature that they could not have been reasonably avoided by consumers.

211.   Defendant's misrepresentations and omissions alleged herein caused Plaintiffs and the members of the California Subclass to purchase their Air Purifiers. Absent these misrepresentations and omissions, Plaintiffs and the members of the California Subclass would not have purchased their Air Purifiers at the prices they paid (or purchased them at all).

212.   Defendant had a duty to disclose these issues because it had exclusive knowledge of the Defect prior to making sales of Air Purifiers, and because Defendant made partial representations about the quality of the Air Purifiers, but failed to fully disclose the problems as well.

213.   As a result of Defendant's misrepresentations and omissions, Plaintiffs and the members of the California Subclass have suffered injury in fact, including lost money or property.

214.   Plaintiffs seeks to enjoin further unlawful, unfair, and/or fraudulent

acts or practices by Defendant under Cal. Bus. & Prof. Code § 17200.

215.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing their unfair, unlawful, and/or deceptive practices, and to restore to Plaintiffs and the members of the California Subclass any money they acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided for under Cal. Bus. & Prof. Code §§ 17203 & 3345; and for such other relief set forth below.

## COUNT IX

### VIOLATIONS OF THE SONG-BEVERLY CONSUMER

### WARRANTY ACT

### FOR BREACH OF IMPLIED WARRANTY

### (Cal. Civ. Code §§ 1790 *et seq.*)

### (On Behalf of the California Subclass)

216.    Plaintiffs Apaliski and Waterman repeat and reallege the above allegations as if fully set forth herein.

217.    Plaintiffs bring this Count individually and on behalf of the California Subclass.

218.    Plaintiffs and the other Class members who purchased Air Purifiers in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

219.    The Air Purifiers are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

220.    Molekule is a "manufacturer" of the Air Purifiers within the meaning

of Cal. Civ. Code § 1791(j).

221.   Defendant impliedly warranted to Plaintiffs and members of the California Subclass that their Air Purifiers were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Air Purifiers are not of the quality that a buyer would reasonably expect.

222.   Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following: (1) Pass without objection in the trade under the contract description; (2) are fit for the ordinary purposes for which such goods are used; (3) are adequately contained, packaged, and labeled; and (4) conform to the promises or affirmations of fact made on the container or label.

223.   An implied warranty of merchantability arose out of and was related to Defendant's sales of the Air Purifiers. Defendant has not validly disclaimed, excluded, or modified the implied warranties, and any attempted disclaimer or exclusion of the implied warranties was and is ineffective. Accordingly, under sections 1792 and 1792.1 of the Act, an implied warranty of fitness and an implied warranty of merchantability arose out of and was related to each and every sale of the Air Purifiers. In particular, by operation of the law, the sale of the Defendant's products includes an implied warranty that the Air Purifiers would be usable for their intended and particular purpose for at least two years after the products were sold. Accordingly, Defendant warrantied, as implied as a matter of law, that the Air Purifiers would serve the particular purpose of "eradicate[ing] the full spectrum of indoor air pollutants," and "completely eliminat[ing] even the most microscopic

pollutants," and "offer[ing] noticeable relief to asthma and allergy sufferers."

224.   The Air Purifiers would not pass without objection in the premium air purifier trade because of the Defect, are not fit for the ordinary purposes for which such goods are used and identified above, and/or fail to conform to the promises or affirmations of fact made by Defendant.

225.   Defendant breached the implied warranty of merchantability by manufacturing and selling Air Purifiers containing the Defect.

226.   Defendant impliedly warranted to Plaintiffs and members of the California Subclass that their Air Purifiers were "required for a particular purpose and that the buyer is relying on the manufacturer's skill or judgment to select or furnish suitable goods" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.1; however, the Air Purifiers are not of suitable for the purposes of Plaintiffs and the members of the California Subclass.

227.   Cal. Civ. Code § 1791.1(b) states: "Implied warranty of fitness" means "(1) that when the retailer, distributor, or manufacturer has reason to know any particular purpose for which the consumer goods are required, and further, that the buyer is relying on the skill and judgment of the seller to select and furnish suitable goods, then there is an implied warranty that the goods shall be fit for such purpose . . . ."

228.   Molekule was aware that many consumers purchased the Air Purifiers for a specific purpose, *e.g.*, to remove airborne pollutants from the air in order to improve air quality that was reduced by the presence of wildfire smoke. Defendant further knew that those consumers were relying on Molekule to furnish goods

suitable to that purpose.

229.   Defendant breached the implied warranty of fitness by manufacturing and selling Air Purifiers containing the Defect.

230.   Furthermore, the Defect has caused Plaintiffs and members of the California Subclass to not receive the benefit of their bargain.

231.   As a direct and proximate result of Defendant' breaches of implied warranties, Plaintiffs and members of the California Subclass received goods whose defective condition substantially impairs their value to consumers. Plaintiffs and members of the California Subclass have been damaged as a result of the diminished value of Defendant's Air Purifiers and the Air Purifiers's malfunctioning.

232.   Defendant also made "express warranties" (set forth above) as defined by § 1791.2 of the Act in connection with the sales of consumer goods to Plaintiffs and those similarly situated. By manufacturing and selling Air Purifiers with the Defect, Defendant breached this written warranty because the Air Purifiers were not free from defects in workmanship and materials for the warranty period and were not suitable for the purpose of "eradicat[ing] the full spectrum of indoor air pollutants," and "completely eliminat[ing] even the most microscopic pollutants," and "offer[ing] noticeable relief to asthma and allergy sufferers" because the Air Purifiers suffered from the Defect.

233.   As a result of Defendant's sale of defective products that do not perform as warranted and are unfit for normal use, Plaintiff, and those similarly situated, have suffered damages.

234.   When Plaintiffs and consumers complained to Defendant that the Air Purifiers suffered from the Defect, Defendant failed to: (i) refund the purchase price of the Air Purifiers, and/or (ii) provide repairs to the Air Purifiers to cure the Defect or provide a replacement Air Purifier without the Defect. Accordingly, Plaintiffs and the California Subclass members have been unable to obtain appropriate relief in the form of replacement, repair or restitution.

235.   Plaintiffs and the California Subclass members have performed all of the conditions of the contract that they were required to perform.

236.   Plaintiffs and California Subclass members have suffered, and will continue to suffer, damages as a result of Defendant's failure to comply with its warranty obligations. Accordingly, Plaintiffs and California Subclass members are entitled to recover such damages under the Act. Cal. Civ. Code §§ 1791.1(d) and 1974.

237.   Plaintiffs and members of the California Subclass have had sufficient direct dealings with either Defendant or their agents to establish privity of contract between Defendant on one hand, and Plaintiffs and each of the members of the California Subclass on the other hand. In any event, privity is not required here because Plaintiffs and each of the members of the California Subclass are intended third-party beneficiaries of contracts (including implied warranties) between Defendant and their retailers.  The retailers were never intended to be the ultimate consumers of the Air Purifiers and have no rights under the warranty agreements provided with the Air Purifiers; rather, the warranty agreements were designed for and intended to benefit the consumers only.

238.   Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and the members of the California Subclass are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Air Purifiers, or the overpayment or diminution in value of their Air Purifiers.

239.   Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

240.   Defendant's breaches of warranty, as set forth above, were willful. Accordingly, a civil penalty should be imposed upon Defendant in an amount not to exceed twice the amount of actual damages.

<u>COUNT X</u>

**VIOLATIONS OF MASSACHUSETTS' CONSUMER PROTECTION LAW**

**(Mass. Gen. Laws Ch. 93a, § 1, *et seq.*)**

**(On Behalf of the Massachusetts' Subclass)**

241.   Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

242.   Plaintiff Joyal brings this Count individually and on behalf of the Massachusetts Subclass.

243.   Plaintiff Joyal, members of the Massachusetts Subclass, and Defendant are "persons" within the meaning of Mass. Gen. Laws. Ch. 93a, § 1(a).

244.   Defendant is engaged in "trade" or "commerce," within the meaning of Mass. Gen. Laws Ch. 93a, § 2.

245.   The law prohibits "unfair or deceptive acts or practices in the conduct

of any trade or commerce." Mass. Gen. Laws Ch. 93a, § 2.

246.   As alleged above, Defendant made numerous false and misleading representations and material omissions concerning the benefits, performance, and capabilities of the Air Purifiers. In purchasing the Air Purifiers, Plaintiff and the other the members of the Massachusetts Subclass were deceived by Defendant's failure to disclose that the Air Purifiers are defective and not effective at improving air quality.

247.   Defendant engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Mass. Gen. Laws Ch. 93A, § 2:

a.    Misrepresenting the approval or certification of goods;

b.    Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

c.    Representing that goods are of a particular standard, quality, or grade, if they are of another;

d.    Disparaging the goods, services, or business of another by false or misleading representation of fact;

e.    Advertising goods with intent not to sell them as advertised;

f.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding;

g.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Air Purifiers,

whether or not any person has in fact been misled, deceived or damaged thereby; and

        h.     Representing that goods have been supplied in accordance with a previous representation when they have not.

248.   Defendant's acts and omissions are unfair in that they (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers.  Defendant has, through knowing, intentional, material omissions, concealed the true defective nature of the Air Purifiers.

249.   Defendant's acts and omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are injuries of a nature that they could not have been reasonably avoided by consumers.

250.   Plaintiff and the members of the Massachusetts Subclass have suffered injury in fact and actual damages resulting from Defendant's material omissions and misrepresentations because, *inter alia*, they lost money when they purchased their Air Purifiers, paid an inflated purchase price for the Air Purifiers, and/or later expended sums of monies to repair their defective Air Purifiers and/or replace filters.

251.   Defendant knew, should have known, or were reckless in not knowing, that the Defect in the Air Purifiers rendered them not suitable for their intended use.

252.   Defendant had a duty to disclose these issues because Molekule had

exclusive knowledge of the defect prior to making sales of Air Purifiers, and because Defendant made partial representations about the quality of the Air Purifiers but failed to fully disclose their defect.

253.   The facts concealed and omitted by Defendant to Plaintiff and the members of the Massachusetts Subclass—that the Air Purifiers are defective—are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Air Purifiers or pay a lower price. Had Plaintiff and the members of the Massachusetts Subclass known about the defective nature of the Air Purifiers, they would not have purchased their Air Purifiers, or would not have paid the prices they paid.

254.   Plaintiff and the Massachusetts Subclass seek an order pursuant to Mass. Gen. Laws Ch. 93A § 9 enjoining Defendant's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under Massachusetts law.

255.   On or about September 4, 2020, Plaintiffs sent a notice letter to Molekule pursuant to Mass. Gen. Laws Ch. 93A § 9(3). Additionally, Defendant had exclusive knowledge of the Defect before the Air Purifiers were sold. Defendant also received notice of the Defect by the large volume of complaints lodged by consumers about the Defect shortly after the product was publicly. These complaints were received directly from consumers as well as from vendors who sold the Air Purifiers who received the complaints and relayed them to Defendant. Because Defendant failed to remedy its unlawful conduct within the requisite time period, Plaintiff seeks all damages and relief to which Plaintiff and

the Massachusetts Subclass are entitled.

## COUNT XI

### VIOLATIONS OF MICHIGAN CONSUMER PROTECTION ACT

### (Mich. Comp. Laws Ann., § 445.903, *et seq.*)

### (On Behalf of the Michigan Subclass)

256.   Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

257.   Plaintiff Fish brings this Count individually and on behalf of the Massachusetts Subclass.

258.   Plaintiff Fish and members of the Michigan Subclass are "consumers" under the MCPA.

259.   The MCPA prohibits the use of any "unfair or deceptive trade practice" in the sale or lease of any consumer goods or services.

260.   As alleged above, Defendant made numerous false and misleading representations and material omissions concerning the benefits, performance, and capabilities of the Air Purifiers. In purchasing the Air Purifiers, Plaintiff and the other the members of the Massachusetts Subclass were deceived by Defendant's failure to disclose that the Air Purifiers are defective and not effective at improving air quality.

261.   Defendant engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Michigan law:

      a.     Misrepresenting the approval or certification of goods;

      b.     Representing that goods have sponsorship, approval,

characteristics, uses, benefits, or quantities which they do not have;

       c.    Representing that goods are of a particular standard, quality, or grade, if they are of another;

       d.    Disparaging the goods, services, or business of another by false or misleading representation of fact;

       e.    Advertising goods with intent not to sell them as advertised;

       f.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding;

       g.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Air Purifiers, whether or not any person has in fact been misled, deceived or damaged thereby; and

       h.    Representing that goods have been supplied in accordance with a previous representation when they have not.

262.   Defendant's acts and omissions are unfair in that they (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers. Defendant has, through knowing, intentional, material omissions, concealed the true defective nature of the Air Purifiers.

263.   Defendant's acts and omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are

injuries of a nature that they could not have been reasonably avoided by consumers.

264.   Plaintiff and the members of the Michigan Subclass have suffered injury in fact and actual damages resulting from Defendant's material omissions and misrepresentations because, *inter alia*, they lost money when they purchased their Air Purifiers, paid an inflated purchase price for the Air Purifiers, and/or later expended sums of monies to repair their defective Air Purifiers and/or replace filters.

265.   Defendant knew, should have known, or were reckless in not knowing, that the Defect in the Air Purifiers rendered them not suitable for their intended use.

266.   Defendant had a duty to disclose these issues because Molekule had exclusive knowledge of the defect prior to making sales of Air Purifiers, and because Defendant made partial representations about the quality of the Air Purifiers but failed to fully disclose their defect.

267.   The facts concealed and omitted by Defendant to Plaintiff and the members of the Massachusetts Subclass—that the Air Purifiers are defective—are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Air Purifiers or pay a lower price. Had Plaintiff and the members of the Massachusetts Subclass known about the defective nature of the Air Purifiers, they would not have purchased their Air Purifiers, or would not have paid the prices they paid.

268.   Plaintiff and the Massachusetts Subclass seek an order pursuant to

Mass. Gen. Laws Ch. 93A § 9 enjoining Defendant's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under Massachusetts law.

269.   On or about September 4, 2020, Plaintiffs sent a notice letter to Molekule pursuant to Mass. Gen. Laws Ch. 93A § 9(3). Additionally, Defendant had exclusive knowledge of the Defect before the Air Purifiers were sold. Defendant also received notice of the Defect by the large volume of complaints lodged by consumers about the Defect shortly after the product was publicly. These complaints were received directly from consumers as well as from vendors who sold the Air Purifiers who received the complaints and relayed them to Defendant. Because Defendant failed to remedy its unlawful conduct within the requisite time period, Plaintiff seeks all damages and relief to which Plaintiff and the Massachusetts Subclass are entitled.

## COUNT XII

## UNJUST ENRICHMENT

270.   Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

271.   Plaintiffs assert this claim on behalf of the Class. In the alternative, this claim is brought on behalf of the State Subclasses.

272.   Plaintiffs and Class Members have conferred a benefit on Defendant by purchasing their Air Purifiers.

273.   The Air Purifiers purchased by Plaintiffs and the class members did not provide the promised performance and instead contained a uniform defect.

274.   Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and class members' Air Purifiers and out-of-pocket repair and filter replacement costs. Retention of such revenues under these circumstances is unjust and inequitable because of the Defect which has caused injury to Plaintiffs and the Class by depriving them of Air Purifiers that are capable of effectively purifying air. Defendant's actions caused further injuries to Plaintiffs and the Class because they would not have purchased their Air Purifiers or would have paid less for them if the true characteristics of the devices had been known at the time of purchase.

275.   Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiffs and the class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the class members for their unjust enrichment, as ordered by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

   a. For an order certifying the proposed class and subclasses and appointing Plaintiffs and their counsel to represent the class and subclasses;

   b. For an order awarding Plaintiffs and class members actual, statutory, punitive, and/or any other form of damages provided by and pursuant to the statutes cited above;

   c. For an order awarding Plaintiffs and class members restitution, disgorgement and/or other equitable relief provided by and

pursuant to the statutes cited above or as the Court deems proper;

d. For an order or orders requiring Defendant to adequately disclose and remediate the Defect.

e. For an order awarding Plaintiffs and the class members pre-judgment and post-judgment interest;

f. For an order awarding Plaintiffs and class members treble damages, other enhanced damages and attorneys' fees as provided for under the statutes cited above and related statutes;

g. For an order awarding Plaintiffs and the class members reasonable attorneys' fees and costs of suit, including expert witness fees;

h. For an order awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated:  November 17, 2020               **DELEEUW LAW LLC**

*/s/ P. Bradford deLeeuw*
P. Bradford deLeeuw (Del. Bar # 3569)
1301 Walnut Green Road
Wilmington, DE 19807
Telephone: (302) 274-2180
Facsimile: (302) 351-6905
E-mail: brad@deleeuwlaw.com

*Attorneys for Plaintiffs*

**OF COUNSEL:**

Nicholas A. Migliaccio
Jason S. Rathod
**MIGLIACCIO & RATHOD LLP**
412 H St., NE
Washington, DC 20002
(202) 470-3520 (Tel.)
(202) 800-2730 (Fax)
E-mail: nmigliaccio@classlawdc.com
 jrathod@classlawdc.com


*Attorneys for Plaintiffs*